IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| EVANGELICAL RETIREMENT | § | Case No. 23-07541 |
| HOMES OF GREATER CHICAGO, | § | |
| INCORPORATED d/b/a FRIENDSHIP | § | |
| VILLAGE OF SCHAUMBURG, | § | |
| | § | |
| | § | |
| FEIN: 36-2815382, | § | |
| | § | |
| Debtor. | § | Hon. Timothy A. Barnes |

**DECLARATION OF MIKE FLYNN, CHIEF EXECUTIVE OFFICER OF THE DEBTOR IN SUPPORT OF THE DEBTOR'S FIRST DAY PLEADINGS**

Mike Flynn, under penalty of perjury, pursuant to 28 U.S.C. § 1746, solemnly affirms that he has read the statements which appear below and that they are, to the best of his knowledge and belief, true and accurate in every respect:

1. I am the Chief Executive Officer of Evangelical Retirement Homes of Greater Chicago, Incorporated d/b/a Friendship Village of Schaumburg ("**FVS**" or the "**Debtor**"), debtor and debtor-in-possession in the above-captioned chapter 11 case.

2. I have served as an executive of the Debtor for most of the last thirty (30) years.

3. I submit this statement in support of the chapter 11 petition and motions (the "**Motions**") which the Debtor filed with the Court on June 9, 2023 (the "**Petition Date**").

4. FVS owns and operates a continuing care retirement community ("**CCRC**") located in Schaumburg, Illinois known as Friendship Village of Schaumburg (the "**Campus**"). The Campus is improved with buildings which include (i) 537 independent living apartments, (ii) 84 assisted living apartments, (iii) 25 memory care apartments, (iv) 169 nursing beds, and (v) related

common areas and parking. Approximately 635 senior citizens reside at the Campus ("**Residents**").

5. In February of 2020, the Debtor was meeting its census and operating goals. Debtor was among the largest CCRC properties in the State. Is reputation for quality care of its Residents was well known. Then came Covid.

6. Suddenly, area hospital beds were beginning to fill up with patients with severe flu-like symptoms. Inconsistent information about what was happening abounded. On March 20, 2020, Governor Pritzker ordered all but essential workers to stay at home. These developments dealt hard blows to the Debtor's business model, which was to promote active lifestyles for Seniors who now found themselves living behind closed doors, cut off from outside friends and family.

7. In the months that followed, the Debtor did what it could to cope with what had become a very hostile business climate for CCRC properties. After months of financial losses, the Debtor, which was financed by bondholders which had secured claims of more that $130 Million Dollars ($130,000,000.00), informed the Bond Trustee that Debtor could no longer afford to pay debt service on the bonds. This led to a decision which was concurred in by the Bond Trustee and the Debtor that it would be best for the everyone concerned, especially the Residents, if the Debtor could find another CCRC operator to affiliate with. So in March of 2021, the Debtor took steps to find a partner.

8. On March 9, 2022, the Debtor engaged B.C. Ziegler and Company ("**Ziegler**") "to act as an advisor" in a process designed to find an organization that would purchase the membership interest in the Debtor. In August 2022, Ziegler received "letters of interest" from a handful of entities who expressed interest in acquiring the Debtor or its assets. The Bond Trustee

-2-

and the Debtor were disappointed with the amount of the all of the bids received. In August of 2022, talks continued with the high bidder in the unsuccessful affiliation process (the "**High Bidder**") in an effort to raise the High Bidder's bid (the "**Bid**"). After approximately three months of negotiations, the High Bidder agreed in principle to raise its Bid. However, the High Bidder notified the Debtor and the Bond Trustee that it preferred to go forward with an asset sale rather than an affiliation. As a result of this change, on January 24, 2023, the Debtor hired a leading broker of senior living properties, Grandbridge Real Estate Capital, of Tampa, Florida ("Grandbridge"), to plan and execute a sale procedure on the assumption that the High Bidder would become the high bidder in the auction.

9. Negotiations with the High Bidder continued for another three months (December 2022 through early March 2023) during which time the amount of the Bid decreased fifteen percent (15%). Then, in the first week of March 2023, the High Bidder informed the Debtor and the Bond Trustee that it preferred to acquire the Debtor's assets in a bankruptcy auction. Previously, the sale process was understood by the Debtor to be a public auction conducted outside of a bankruptcy proceeding. The Debtor responded to this change by preparing to enter bankruptcy while the negotiations with the High Bidder over the terms of the Bid continued without resolution. Grandbridge, in the meantime, planned the sale process, established a data room and took further steps to move the sale effort forward.

10. On April 17, 2023, the High Bidder withdrew its Bid and terminated further discussions.

11. The Debtor responded to this series of disappointing developments by preparing to enter bankruptcy to implement a sale process designed by Grandbridge to identify a "stalking

horse" bidder for the Campus by August 28, 2023, followed by an auction of the Campus and related non-cash assets conducted in bankruptcy court on October 3, 2023, and a closing of the sale in December 2023.

### Information germane to individual motions[1]

**Sale Motion**

12.  The Debtor and its professionals will market substantially all of the Debtor's assets (the "**Assets**") prior to the Auction in the manner set forth in the Bid Procedures Order. During this marketing process, the Debtor reserves the right to enter into a stalking horse agreement (the "**Stalking Horse Agreement**") with a bidder if the Debtor believes that such an agreement will further the purposes of the Auction by, among other things, attracting value-maximizing bids. If the Debtor determines that entering into a Stalking Horse Agreement would be appropriate, any such Stalking Horse Agreement shall be executed no later than August 24, 2023 at 4:00 p.m.[2]

13.  As part of the proposed sale process, the Debtor and Grandbridge will engage in a robust marketing effort for the Debtor's Assets, contacting both financial and strategic investors regarding a potential sale process. Grandbridge will not place any conditions on potentially interested parties regarding bid levels, structure, financing, or management in connection with the solicitation of indications of interest. All interested contact parties will be given an opportunity to execute a confidentiality agreement. Those parties that execute a confidentiality agreement will be provided with the opportunity to access, through a data room, substantial due diligence information concerning the Debtor, including access to financial, operational, and other detailed information.

---

[1] Capitalized terms not otherwise defined herein shall have the same meanings as defined in the relevant Motion being discussed.
[2] All times listed are in Central Standard Time, unless otherwise noted.

14. Given the Debtor's liquidity challenges, the Debtor believes a robust marketing process combined with a prompt sale of the Debtor's business and/or its Assets represents the best option available for all stakeholders in the Chapter 11 Case.

15. To optimally and expeditiously solicit, receive, and evaluate bids in a fair and accessible manner, the Debtor has developed and proposed the Bid Procedures, attached as **Exhibit 1** to the Bid Procedures Order. The Bid Procedures were designed to permit a relatively expedited sale process, promote participation and active bidding, and ensure that the Debtor receives the highest or otherwise best offer for the Assets. The Debtor believes that the timeline for consummating the sale process established pursuant to the Bid Procedures is in the best interest of its estate and all parties in interest.

16. The Bid Procedures describe, among other things, the requirements for prospective purchasers to participate in the bid process, the availability and conduct of due diligence, the deadline for submitting a competing bid, the method and factors for determining Qualified Bids, and the criteria for selecting a Successful Bidder.

17. Importantly, the Bid Procedures recognize the Debtor's fiduciary obligations to maximize sale value and, as such, do not impair the Debtor's ability to consider all Qualified Bid proposals. Additionally, the Bid Procedures preserve the Debtor's right to modify the Bid Procedures as necessary or appropriate to maximize value of the Debtor's estate.

18. The Debtor believes that the proposed timeline maximizes the prospect of receiving the highest and best offer while taking into consideration the Debtor's liquidity constraints. To further ensure that the Debtor's proposed Auction and Sale process maximizes value for the benefit of the Debtor's estate, the Debtor and its professionals will use the time following entry of the Bid

Procedures Order to actively market the Assets with the aim of soliciting the highest or otherwise best bids possible. The Debtor believes the relief requested by the Sale Motion is in the best interests of its creditors, other stakeholders, and all other parties in interest, and should be approved.

**Cash Collateral Use**

19. The Debtor's business is a "health care business" within the meaning of 11 U.S.C. § 101(27A) (hereinafter, e.g., Section 101(27A) of the Bankruptcy Code).

20. The Debtor believes that the Bond Trustee holds a perfected first priority security interest on certain real and personal property owned by the Debtor (collectively, the "**Encumbered Assets**"), including the Campus and all tangible and intangible personal property owned by the Debtor which can become encumbered by grant and filing under Article 9 of the Uniform Commercial Code as adopted in the State of Illinois.

21. The Debtor believes that the Bond Trustee does not have a lien on the following personal property of Debtor's estate (collectively, the "**Unencumbered Assets**"), including:

    a. Schwab One Account ending in -832 ("**Schwab Account -832**") which contains securities valued at $1,411,330.02 on June 2, 2023, which account is unpledged to any lienholder;

    b. Schwab One Account ending in -290 ("**Schwab Account -290**") which contains securities valued at $4,112.90 on June 2, 2023, which account is unpledged to any lienholder;

    c. A checking account with Schaumburg Bank & Trust Company, N.A. (the "**Bank**"), whose address is 9801 W. Higgins, Box 32, Rosemont, IL 60018), which account's last four digits are 1095, with a balance of $20,000.00 on the Petition Date (the "**Operating Account**");

    d. An account with Schaumburg Bank & Trust Company, N.A. (the "**Bank**"), whose address is 9801 W. Higgins, Box 32, Rosemont, IL 60018) (the "**Concentration Account**"), which account's last four digits are 4931, whose

88684932.2

      purpose is to receive payments from the Centers for Medicare and Medicaid Services ("**CMS Receivables**") and sweep the proceeds of those receivables into the Operating Account. The Concentration Account held a balance of $0 on the Petition Date;[3]

    e. five (5) unencumbered titled motor vehicles with a collective value (based on Edmund's data) of $31,962.53.

22.    The Indenture and the liens granted thereunder secure two separate obligations, which are:

    a. [Illinois Finance Authority Revenue Bonds, Series 2017 (Friendship Village of Schaumburg) in the aggregate principal amount of $122,550,000 pursuant to the Bond Indenture (the "**2017 FVS Bonds**") which on information and belief, on April 30, 2023 had a principal balance of $115,180,000 and interest due of $5,595,502, totaling One Hundred Twenty Million Seven Hundred Seventy-Five Thousand Five Hundred Two Dollars ($120,775,502.00); and ]

    b. [Evangelical Retirement Homes of Greater Chicago, Incorporated Direct Note Obligation, Series 2017 (UMB Bank, National Association – Friendship Senior Options, NFP Guaranty), in the original principal amount of $13,750,000 and having, on Debtor's information and belief, as of January 31, 2023, a current principal amount due of approximately $10,115,000 principal and $153,387 interest, totaling Ten Million Two Hundred Sixty-Eight Thousand Three Hundred Eighty Seven and no xx/100 Dollars ($10,268,387.00) ] (the "**Series 2017 Obligation**" and together with the 2017 FVS Bonds, the "**Obligations**").]

23.    The sum of the bond debt secured by the liens and security interests of the Bond Trustee is One Hundred Thirty-One Million Forty-Three Thousand Eight Hundred Eighty-Nine Dollars ($131,043,889.00).

---

[3] The Debtor receives payments from the Centers for Medicare and Medicaid Services ("CMS") for services provided by the Debtor to Medicare and Medicaid patients which payments are not susceptible to encumbrance under 42 CFR § 424.8 while in the Concentration Account. The Debtor believes that the Bond Trustee does not have a lien on the proceeds of CMS Receivables. The Debtor does not have a perfected lien on the proceeds of the CMS Receivables that are swept into the Operating Account because it does not control the Operating Account. CMS Receivables account for approximately 25% to 30% of the Debtor's monthly revenue.

24. The value of the Encumbered Assets is materially less than the value of the Bond Trustee's secured claim. As a consequence, interest and certain fees will not accrue on the Bond Trustee's secured claim on and after the Petition Date. 11 U.S.C. § 506 (a) and (b).

25. The Debtor intends to present this Motion for a preliminary hearing on June __, 2023 and a final hearing on June 29, 2023. At the preliminary hearing, pursuant to Rule 4001(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Debtor will ask the Court for authority to use only that amount of Cash Collateral that is necessary to avoid immediate and irreparable harm to the estate pending the final hearing on this Motion on June 29, 2023. The Debtor calculates that it needs approximately $3,443,245.00 to pay such expenses. At the preliminary hearing, pursuant to Rule 4001(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Debtor will ask the Court for authority to use only that amount of Cash Collateral that is necessary to avoid immediate and irreparable harm to the estate pending the Final Hearing. Pending the Final Hearing on the Motion, the Debtor may spend a total of $3,443.245.00, to use only that amount of Cash Collateral that is necessary to avoid immediate and irreparable harm to the estate pending the final hearing. These emergency cash expenditures of Cash Collateral would be used consistent with the Budget attached to this Order as Exhibit A, to pay for expenses incurred by the Debtor in the following categories:

    a. $1,056,335.00 for payroll, benefit and tax obligations;

    b. $208,268.00 adequate protection to utility providers;

    c. $151,397.00 to outsourced labor;

    d. $539,334.00 to Dietary

    e. $1,391,129.00 to Insurance

88684932.2

    f.    $96,783.00 emergency repairs to the Campus.

Total: $3,443,245.00.

27. The Debtor believes that having access to the foregoing funding from Cash Collateral will enable it to maintain the level of personal service and care which is critical to Residents, allay concerns of employees, and avoid needless interference with the effort by Debtor's professionals to promote interest of those entities who might be interested in purchasing the Campus.

**Cash Management and Business Forms**

27. Debtor owns the Operating Account, the Concentration Account, the Escrow Account, Schwab Account -832, Schwab Account -290 and Schwab Account -078.

28. The Escrow Account complies with section 345(b) of the Bankruptcy Code because the Escrow Agent maintains the proceeds of option deposits at PNC Bank which is an "approved" depository on the list maintained by the US Trustee in this district.

29. The employees who work at the Campus are not employed by the Debtor. Instead, they are employed by the Debtor's corporate manager, Friendship Senior Options, NFP ("**FSO**"), which leases the services of the employees to the Debtor, which, in turn pays FSO for the costs of wages and salary, benefits and taxes through the Cash Management System.

30. FSO provides the Debtor with certain goods and services such as accounting services, billing and collection services, Human Resources, IT, Purchasing and contracting for insurance, contracting with clinical assessment coordinators, among others. In the cash collateral budgets used in this Case (the "**Budget**"), expenditures which are labeled in the Budget as "Management Fees" are actually payments for shared services, goods and other needed items

which FSO has sold, leased or otherwise provided to the Debtor. The Intercompany Transactions which the Debtor pays FSO are recorded by FSO and FVS to their respective intercompany accounts, which they reconcile at the end of each month. These Intercompany Transactions allow FVS, among other things, to meet the needs of Residents and maintain a centralized corporate administration in an efficient and cost-effective manner.

31. In addition to the goods and services which the Debtor receives from FSO, the Debtor also directly contracts with many vendors and creditors. The disbursement procedures under the Cash Management System for these vendors or other creditors, with one exception, are the same. First, the Debtor identifies bills to be paid (usually on Thursdays). Next, Debtor transfers a deposit to FSO to pay those bills. Then, FSO promptly pays the bills, in the amounts designated by the Debtor, from FSO's accounts. Only one creditor of the Debtor regularly receives payment by ACH directly from Debtor, paid from the Operating Account. Rarely, a vendor will ask for payment by ACH or wire transfer, and Debtor will comply with such requests. But requests such as these are rare.

32. In the ordinary course of business, the Debtor uses the Cash Management System to efficiently collect, transfer, and disburse funds generated by the Debtor's business operations. The Cash Management System facilitates the Debtor's cash monitoring, forecasting, and reporting. The Debtor accurately records all collections, transfers, and disbursements made through the Cash Management System as they are made.

33. The Debtor's business operations are sizable and complex. If the U.S. Trustee's requirements were strictly enforced in this Case, undue disruption would result to the Debtor's finances and business operations (especially CMS Payments) and the Debtor's efforts in Chapter

11 could be negatively impacted as well. In order to continue its operations for the short time in which operations will be needed and preserve the value of its business, the Debtor must be able to continue conducting "business as usual" to the maximum extent possible.

34. The Debtor's financial operations also permit it to distinguish pre-petition and post-petition transactions and generate detailed and accurate financial reports without closing the Accounts and reopening new ones.

35. As indicated in other motions which FVS has filed or will file with the Court contemporaneously with this Motion, FVS plans to sell the Campus in a public auction conducted in this Court. The procedures which FVS seeks to put in place are designed to facilitate a public auction of the Campus on or about October 3, 2023. Given the expected duration of the Debtor's anticipated operations in Chapter 11, the harm and disruption which would likely occur if the Debtor was required to unwind its financial system and amend its Business Forms outweighs any potential harm which may come from the granting of the relief requested in this Motion.

**Motion to Utilize Addendum And Escrow Account**

36. Residents who live in the independent living apartments, assisted living apartments and assisted living – memory care apartments at the Campus receive housing, meals, physical security, programming and services from the Debtor, as appropriate to their physical condition and needs, all of which are designed to foster the Residents' independence and help them, if they so choose, to remain engaged in the broader community.

37. Prospective residents who are interested in living at the Campus ("**Prospective Residents**") typically place deposits with the Debtor. Prospective Residents who wish to go on a

wait list for a type of apartment that is currently unavailable at the Campus can do so with a $10,000 to $20,000 deposit (the "**Wait List Deposit**").

38. When a Prospective Resident has selected an apartment at the Campus that is (or will shortly) be available for occupancy, the Debtor and the Prospective Resident enter into a second agreement (the "**Reservation Agreement**"). Under the Reservation Agreement, the Prospective Resident agrees to give the Debtor a $10,000 to 20,000 deposit (the "**Reservation Deposit**"), although the Prospective Resident will receive a credit against that Reservation Deposit if the Prospective Resident previously paid a Wait List Deposit to the Debtor.

39. Before occupying an independent living, assisted living or assisted living – memory care apartment at the Campus, Prospective Residents are required to execute a residency agreement ("**Residency Agreement**"). The Residency Agreement provides the terms and conditions for the Prospective Resident while residing at the Campus, and also outlines the Prospective Resident's obligations regarding, among other things, the payment of an entrance fee (an "**Entrance Fee**") to the Debtor's as well as the Resident's rights to a refund of such Entrance Fees. The Residency Agreements which are currently used for new Residents who move into independent living, assisted living and assisted living – memory care apartments, together with the Wait List Agreement and the Reservation Agreement, will be referred to herein as the "**Contracts**").

40. The size of the Entrance Fee is determined on a number of factors, including the size of the apartment occupied and the level of care which occupants of a given apartment may require, among other considerations. The Entrance Fees collected by the Debtor from new Residents currently range between $133,000 and $597,000 in independent living apartments and between $99,000 and $162,000 in assisted living apartments and memory care apartments.

41. The full amount of the Entrance Fee is due to the Debtor when a Prospective Resident completes a move into the Campus. Unless otherwise requested by the Prospective Resident, the funds previously comprising the Reservation Deposit and the Wait List Deposit (if made) become part of the required Entrance Fee, and the Prospective Resident funds the difference between the amounts previously deposited and the amount of the required Entrance Fee.

42. The Resident Agreements currently in use at the Campus give Prospective Residents a right to choose to receive a refund of between 0% and 90% of the Entrance Fee which they may pay to the Debtor before moving into their chosen apartment in the Campus (an "**Entrance Fee Refund**"). Entrance Fee Refunds normally become payable after the Resident either passes on or moves out of the Campus and their former apartment is re-occupied by a new Resident.

43. Prompted by this development, FVS made a business decision to create an escrow system that would enable Prospective Residents make a deposit into an escrow account (the "**Escrow Account**") in exchange for the option of converting the deposit into an entrance fee and his or her Residency Agreement into a life care contract upon the occurrence of certain triggering events. FVS created an escrow relationship with TMI Trust Company, a Florida trust company, (the "**Escrow Agent**"), pursuant to the terms and conditions of the Escrow Agreement (the "**Escrow Agreement**," a true copy of which is attached hereto as **Exhibit A**. Prospective Residents would opt-in to the escrow system by signing an "Addendum To Contract At Friendship Village Of Schaumburg" (the "**Addendum**") the form of which is attached to the Escrow Agreement as Exhibit D.

44. The escrow arrangement works in the following way:

   a. Before taking physical possession of an apartment in the Campus, a Prospective Resident will pay an Option Deposit to the Debtor which the Debtor will deposit in the Escrow Account.

   b. At any time during the Case, the Debtor, in its sole judgment, may determine that a "Trigger Event" (the "**Trigger Event**") has occurred. The Addendum (Exhibit A, p. 2, par. 4) defines a Trigger Event to be: (a) a significant financial restructuring of FVS, (b) a transaction related to FVS that involves a merger, sponsor substitution, or change of control, or (c) the sale of FVS's CCRC.

   c. Once the Debtor determines that a Trigger Event has occurred, as set forth under paragraph 6 of the Escrow Agreement, the Debtor must send a written notice of the Trigger Event to the applicable Resident (in the manner provided for in the Residency Agreement). The Escrow Account will terminate on the 22nd day after the date such notice is provided (the "**Escrow Termination Date**"). At any time before the Escrow Termination Date, a Resident may give FVS a written request of termination of the Contract and request for refund ("**Refund Request**"). If a Resident does not give FVS such Refund Request before the Escrow Termination Date, the Addendum shall (i) automatically terminate; (ii) the escrow of the Option Deposit shall terminate; (iii) the Escrow Agent shall deliver the applicable balance of the Option Deposit to FVS or its assigns; (iv) FVS shall credit the Option Deposit toward satisfying the Entrance Fee requirement under the Contract, retroactive to the date of the Contract; and (v)

-14-

the terms of the Contract shall govern the rights of Resident and FVS and its assigns, as if the parties had never executed and entered into this Addendum.

d. As set forth in paragraph 7 of the Escrow Agreement, if a Resident timely gives FVS a Refund Request before the Escrow Termination Date, FVS shall: (i) terminate the Contract; and (ii) refund to the Resident, within 30 days after Resident vacates his or her apartment, the Option Deposit, minus fees or charges Resident has incurred under the Contract prior to vacating the unit but not yet paid to FVS. FVS will not pay Resident any interest on the Option Deposit.

45. The Addendum empowers Residents to keep their apartments or leave and get their money back with no questions asked. The only requirements for a Resident to perfect the Resident's right to receive a refund of their Option Payment is that the Refund Request must be in writing, delivered to the Debtor within 21 days of the date of the notice. However, payment of that refund will be made by the Debtor within 30 days of the date upon which the withdrawing Resident exits the Campus and they have otherwise paid the Debtor for amounts which became due before the Resident and the Resident's property were removed from the Campus.

46. The Addendum allows Residents who move (or are thinking about moving) into the Campus during the pendency of this Case (i.e., before the Trigger Date) the security of knowing they will have the option of continuing to reside in the Campus or, if the Resident is not satisfied with the results of the bankruptcy process, they can move elsewhere and still receive a full and prompt refund of their Option Deposit which they have placed with the Debtor during the Case.

47. The Debtor has used the procedure outlined in the Addendum since April 2023. The Debtor would like to continue to use the Addendum for all new Contracts which it receives as this Case unfolds. Escrow arrangements such as the one proposed by this Motion are not ordinarily employed in the senior living industry. For that reason, the Debtor believes that it must receive the Court's approval to employ the Addendum in this Case as required by 11 U.S.C. § 363(b)(1).

**Patient Care Ombudsman**

48. This Case was not filed as a result of care-based issues. Instead, this Case was filed by the Debtor because of the financial disruptions in the Debtor's business caused initially by the Covid-19 pandemic and the difficulty which the Debtor has experienced in its efforts to build census which diminished in the months after February of 2020.

49. The Debtor is licensed and subject to oversight by several State authorities, including IDPH, and is the subject of regular inspections by those authorities. The most recent survey in 2023 resulted in five level D tags. In 2022 there were 4 level D and 1 level E tag. In 2021, there were 6 level D, 2 level E, one level G and 2 level L tags. In 2020, there were 4 level D tags. The star rating was 5 in 2020. 1 in 2021 and 2022 and 2 in 2023.

50. The Debtor has a good record when it comes to resident care. There have been no reportable incidents involving residents of assisted living apartments, memory care apartments or skilled nursing units in the past twelve months that have resulted in licensure violations. All inspection survey deficiencies were immediately addressed and corrected.

51. One of the great advantages of living in a CCRC is the sense of community which develops among the Residents. This is true at the Campus, where there are ties of friendship between the Residents, who tend to look out after one another and would be in a position to

know if the care which the Debtor affords to any Resident has fallen below the Debtor's typically high standards. Further, and with the exception of the Residents of the memory care apartments, the residents in the Campus tend to be quite aware of their own individual conditions, and quite capable of initiating steps to correct any perceived deficiencies in their own care.

52. The majority of the Campus's Residents are not dependent on the Debtor for healthcare. The services and programs that the Debtor provides to all of its Residents (including those in independent living) are designed to maximize the independence of every Resident and minimize their dependency on the Debtor.

53. The likelihood of tension between the interests of the patient and the Debtor. There is no likelihood or indication of tension between Residents and the Debtor. All parties' interests are aligned in seeking a successful reorganization of the Debtor in an expeditious manner so that the Debtor can continue serving the Residents.

54. The potential injury to the patients if the debtor drastically reduced its level of patient care. The Debtor has no intention of reducing the level of care in any part of the Campus, or make changes to the individuals who are providing that care to the Residents who need it.

55. The presence and sufficiency of internal safeguards to ensure the appropriate level of care. The Debtor has its own systems in place to monitor Resident care and report to management should any incidents or deficiencies occur. Furthermore, the Debtor's internal quality management program provides Residents with the means to file any grievances.

56. The impact of the cost of the ombudsman on the likelihood of a successful reorganization. The Debtor has a limited amount of funds which are available for the payment of creditors in this case. The fees and costs generated by a health care ombudsman in this case will

necessarily erode the amount of funds available to pay creditors. The likely benefit to residents, creditors and the Debtor's estate from the appointment of an ombudsman is minimal and difficult to justify under the circumstances.

**Utilities Motion**

57. In connection with the operation of its business, the Debtor incurs utility expenses for water, sewer service, electricity, gas, cable, internet, telephone, waste disposal and other similar utility services (collectively, the "**Utility Services**") provided by the Utility Providers. The Utility Services are provided to the Debtor by the Utility Providers identified in **Exhibit 1** to this Motion which is incorporated herein by reference (the "**Utility Service List**"), in the estimated total monthly amount of $214,975.00 as listed in **Exhibit 1** to the Motion. The Debtor's average monthly utility payment to each Utility Provider is set forth on the Utility Service List.

58. The Debtor estimates that its post-petition use of the Utility Services will remain approximately at the same levels, although seasonal effects and variations in the prices of such services may result in variations in the Debtor's average monthly utility expenses.

59. Uninterrupted Utility Services are critical to the Debtor's ability to sustain its operations during the pendency of this Case. Any interruption in the Utility Services, however slight, would jeopardize the Debtor's ability to operate its business and the safety and comfort of the Debtor's residents, as well as the Debtor's efforts in this Case to sell its assets and/or restructure its business through chapter 11.

60. As of the Petition Date (June 8, 2023) the Debtor is current in its payments to each of the Utility Providers. The Debtor has not placed deposits with any of the Utility Providers. The Debtor estimates that it has accrued but not paid utility obligations for parts of the months of and

88684932.2

early June 2023 approximately equal to the Debtor's monthly average. Most if not all of these payments will come due within the first twenty-one (21) days after the Petition Date.

Dated: June 8, 2023           By:    *[signature]*
                                     Mike Flynn, CEO
                                     Friendship Village of Schaumburg

Prepared by:

Bruce Dopke, Member (ARDC # 3127052)
Dopkelaw LLC
1535 W. Schaumburg Road, Suite 204
Schaumburg, IL  60194
Tel: 847-524-4811
bd@dopkelaw.com