# Exhibit A

Proposed Sale Order

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| EVANGELICAL RETIREMENT | § | Case No. 23-07541 |
| HOMES OF GREATER CHICAGO, | § | |
| INCORPORATED d/b/a FRIENDSHIP | § | |
| VILLAGE OF SCHAUMBURG, | § | |
| | § | |
| FEIN: 36-2815382, | § | |
| | § | |
| Debtor. | § | Hon. Timothy A. Barnes |

**ORDER APPROVING THE SALE OF REAL ESTATE**
**COMMONLY REFERRED TO AS THE HUNTLEY PROPERTY**

Upon the motion (the "**Motion**") of the above-captioned debtor and debtor in possession (the "**Debtor**") for entry of an order (this "**Order**") authorizing and approving the sale of certain real estate located at PIN #02-08-401-018 in the County of Kane in the state of Illinois (the "**Property**"), pursuant to that certain Real Estate Purchase and Sale Agreement (the "**PSA**") attached hereto as **Exhibit 1**; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. § 1408; and this Court having found that the relief requested in the Motion is in the best interest of the Debtor's estate, its creditors, and other parties in interest; and this Court having found that notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "**Hearing**"); and this Court having

determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor,

**THE COURT HEREBY FINDS AND DETERMINES THAT**:

A.     The findings and conclusions set forth in here constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.

C.     This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

D.     Venue is proper in this District pursuant to 28 U.S.C. § 1408.

E.     The bases for the relief requested in the Sale Motion are sections 105(a) and 363 of title 11 of the United States Code (the "**Bankruptcy Code**") and Bankruptcy Rules 2002, 6004, and 6006(a).

F.     This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds for good cause shown that there is no cause or legitimate reason for delay in the implementation of this Sale Order, particularly given the lengthy and diligent efforts made by the Debtor to market the Property, and waives any stay or

delay as set forth herein, including the stays provided for in Bankruptcy Rules 6004(h) and 6006(d).

G.    The Debtor has articulated good and sufficient reasons for this Court to approve the sale of the Property, pursuant to the PSA, to The Prime Group, Inc., an Illinois corporation, or its designee or permitted assignee (the "**Purchaser**").

**IT IS HEREBY ORDERED THAT**:

1.    The Motion is GRANTED, as set forth herein.

2.    All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the Hearing or by stipulation filed with the Court, are overruled.

3.    This Sale Order and the PSA shall be binding in all respects upon all creditors of and holders of equity interests in the Debtor (whether known or unknown), agents, trustees and collateral trustees, holders of interests in, against, or on the Property, or any portion thereof, all successors and assigns of the Debtor, and any subsequent trustees appointed in the Chapter 11 Case or upon a conversion of the above captioned case (the "**Chapter 11 Case**") to a case under chapter 7 of the Bankruptcy Code and shall not be subject to rejection or unwinding. Nothing in any chapter 11 plan confirmed in the Chapter 11 Case, the confirmation order confirming any such chapter 11 plan, any order approving the wind down or dismissal of the Chapter 11 Case or any subsequent case under Chapter 7 of the Bankruptcy Code, or any order entered upon the conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code or thereafter or otherwise shall vacate, conflict with or derogate from the provisions of the PSA or this Sale Order.

4.    The PSA and all other ancillary documents, and all of the terms and conditions thereof, are hereby approved.

92047877.2

5.       Pursuant to Bankruptcy Code sections 363(b) and (f), the Debtor is authorized, empowered, and directed to use its best efforts to take any and all actions necessary or appropriate to (a) consummate the sale pursuant to and in accordance with the terms and conditions of the PSA, (b) close the sale as contemplated in the PSA and this Sale Order, and (c) execute and deliver, perform under, consummate, implement, and fully close the PSA, in accordance with the procedures set forth therein, together with additional instruments and documents that may be reasonably necessary or desirable to implement the PSA and the sale.

6.       The Debtor is authorized to take all actions necessary to effect the relief granted pursuant to this Sale Order in accordance with the Motion.

7.       Notwithstanding any Bankruptcy Rule to the contrary, this Sale Order shall be immediately effective and enforceable upon its entry.

8.       The Court shall retain jurisdiction over any and all matters arising from the interpretation, implementation, or enforcement of this Sale Order.

92047877.2

# Exhibit 1

Real Estate Purchase and Sale Agreement

## REAL ESTATE PURCHASE AND SALE AGREEMENT

THIS REAL ESTATE PURCHASE AND SALE AGREEMENT (this "Agreement") is made as of the __ day of November, 2023 (the "Effective Date") by and between **Chicago Title Land Trust Company, as trustee under Trust Agreement dated as of June 13, 2000 and known as Trust No. 1108559** and **Evangelical Retirement Homes of Greater Chicago, Incorporated d/b/a Friendship Village of Schaumburg**, an Illinois not-for-profit corporation, its beneficiary (collectively, "Seller"), and **The Prime Group, Inc.**, an Illinois corporation, or its designee or permitted assignee ("Purchaser").

## W I T N E S S E T H

WHEREAS, Seller is the owner of a certain parcel of land consisting of approximately 5.0 acres of undeveloped vacant land commonly known as partial Lot 3 in Huntley Corporate Park Phase 2 Subdivision located in Huntley, Kane County, Illinois 60142, and more particularly described in attached **Exhibit A**, incorporated by reference (the "Real Estate"); and

WHEREAS, Purchaser desires to purchase from Seller, and Seller desires to sell to Purchaser, the Property (defined below), for the Purchase Price (defined below) and upon the terms and conditions set forth below subject to receipt of the Sales Order (defined below);

NOW, THEREFORE, for and in consideration of the mutual promises, covenants and conditions hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Purchaser and Seller hereby covenant and agree as follows:

1.     Purchase and Sale.  Seller hereby agrees to sell, convey and transfer to Purchaser, and Purchaser hereby agrees to purchase from Seller, the Property for the Purchase Price and upon the terms and conditions provided herein.  The "Property" consists of the Real Estate, together with any and all improvements, easements, rights, privileges and appurtenances belonging or otherwise appertaining thereto, including without limitation, all mineral, oil and gas and other subsurface rights, development rights, air rights, and water rights related to the Real Estate which are owned by Seller, if any.

2.     Purchase Price and Earnest Money.

(a)     Purchase Price.  The purchase price for the Property (the "Purchase Price") shall Four Hundred Fifty Thousand and No/100 Dollars ($450,000.00), subject to prorations as provided in this Agreement.

(b)     Earnest Money.  Within two (2) business days after the Effective Date of this Agreement, Purchaser shall deposit in an escrow account (the "Escrow Account") established with the Title Company (defined below), as escrow agent (the "Escrow Agent"), earnest money in the amount of Twenty Thousand and No/100 Dollars ($20,000.00) (the "Earnest Money") via wire transfer of immediately available funds which

Earnest Money shall be held and invested by the Escrow Agent as directed by Purchaser and otherwise in accordance with the terms of a separate, standard joint order escrow agreement.

The Earnest Money shall be nonrefundable to Purchaser except as otherwise specifically provided in this Agreement. The Earnest Money shall be applied as a credit against the Purchase Price at Closing or otherwise in the manner provided in this Agreement. At Closing (defined below), the Earnest Money shall be delivered to Seller and applied toward the Purchase Price for the Property payable by Purchaser at the Closing.

If Purchaser elects to terminate this Agreement in the manner provided in this Agreement, Purchaser shall  deliver to Seller, within five (5) business days following the termination of this Agreement by Purchaser, copies of Purchaser's third-party reports, studies, documents, and other third-party materials related to the Property (except that Purchaser shall not be required to deliver to Seller any information that Purchaser deems confidential or proprietary).

3.      <u>Pre-Closing Activities of Purchaser and Purchaser Indemnification</u>.

(a)      Omitted.

(b)      <u>Purchaser's Right to Enter Property and Indemnification</u>.  Purchaser, its agents, contractors, and employees shall have the right, at their own peril, cost, and risk and with no liability to be incurred by Seller, at any reasonable time or times after the Effective Date of this Agreement and until the earlier of the Closing or the termination of this Agreement, to enter upon the Property for the purpose of conducting such tests (including soil tests and soil borings), investigations and inspections as Purchaser deems necessary or desirable, provided that prior to such entry  on to the Property, Purchaser shall provide to Seller evidence of Purchaser's commercial general liability insurance (or that of its contractor) in form and content reasonably acceptable to Seller in an amount not less than $2,000,000, which name Seller as an additional insured.  Purchaser shall, at Purchaser's sole cost and expense, promptly repair any damage to the Property caused by such inspections and testing and restore the entire Property to the condition in which the same were found before such inspection, testing, or disturbance. In addition, Purchaser shall indemnify, defend and hold harmless Seller and Seller's members, managers, shareholders, directors, officers and employees (the "<u>Indemnified Parties</u>") from and against any and all claims, costs, damages, expenses (including reasonable attorneys' fees) or liabilities suffered or incurred by or asserted against any such Indemnified Parties arising from any entry and/or testing by Purchaser and/or its agents, contractors, and employees upon the Property, or the conduct of such tests and inspections or other on-site actions taken by any of such persons or representatives, whether before or after the Closing or termination of this Agreement. Purchaser shall provide not less than two (2) business days' prior written notice to Seller of Purchaser's intent to conduct any investigations, study, test, or access to the Property. Seller shall have the right to coordinate all such inspections, studies, tests, or access. Seller's representatives shall be provided with an opportunity to and shall be permitted to accompany Purchaser or its representatives during each such

investigation, study, and test. Purchaser and its agents, contractors, and employees shall comply with the agreed upon procedures and with any and all laws, ordinances, rules and regulations applicable to any or all of such procedures and the Property. Unless required by applicable law, regulation, or subpoena, neither Purchaser or Purchaser's agents, contractors, or employees shall report the results of any inspection, study, testing to any governmental or quasi-governmental authority under any circumstances without obtaining Seller's express written consent, which consent may be withheld in Seller's sole discretion. Notwithstanding any provisions in this Agreement to the contrary, Purchaser's obligation under this Section 3(b) shall survive the Closing or earlier termination of this Agreement.

(c)     Development Cooperation.   If requested by Purchaser, Seller shall cooperate (at no material cost to Seller) with Purchaser in Purchaser's efforts to obtain zoning and development approvals for Purchaser's intended development of the Property following the Effective Date of this Agreement.  In furtherance of such cooperation, Seller shall execute at Purchaser's request all zoning, PUD, development and/or site approval applications, requests for permits and other applications and/or documents in connection with Purchaser's intended development of the Property, provided that such applications, actions and approvals shall not be binding upon Seller or require Seller to incur any cost or liability, nor shall any of such approvals bind the Property prior to Closing.

4.     Plat of Survey; Documents relating to the Property.  Following the Effective Date, Seller shall  deliver to Purchaser the following documents and materials, to the extent the same are in Seller's possession or control: (a)   its existing ALTA survey of the Property in Seller's possession, and (b) all other agreements, documents, studies, test and reports (including soil tests and soil borings and related geotechnical analysis  and reports, wetlands delineations, and environmental studies, and all other documents, information, studies and reports) relating to the Property and/or the ownership, operation or use thereof.

5.     Title To Be Conveyed.  At the Closing, Seller shall convey or cause to be conveyed to Purchaser by a recordable Special Warranty Deed (the "Deed"), title to the Property, free and clear of any and all liens, and encumbrances, except for (a) applicable zoning and building ordinances and land use regulations; (b) such state of facts as would be disclosed by a physical inspection and/or the Current Survey (as defined in Section 6(a) below) of the Property; (c) the lien of taxes and assessments not yet due and payable; (d) any exceptions caused by Purchaser, its agents, representatives or employees; (e) all exceptions to title disclosed in the Title Commitment (hereinafter defined) that are not timely objected to by Purchaser; and (f) any matters deemed to constitute Permitted Exceptions under Section 6 hereof (collectively, the "Permitted Exceptions").

6.     Title Commitment, Survey Defects and Unpermitted Exceptions.

(a)     Within ten (10) business days following the Effective Date, Purchaser shall order a current ALTA survey of the Property ("Current Survey") and a commitment for an ALTA Form B Owner's policy of title insurance (the "Title Commitment") issued by First American Title Insurance Company (the "Title Company") covering title to the Property and naming Purchaser as proposed insured, and will obtain a copy of all easements, covenants and other documents listed in the Title Commitment as exceptions to title or otherwise identified in the Title Commitment (the "Exception Documents").  Purchaser

3

shall deliver a copy of the Title Commitment and all Exception Documents to Seller promptly following Purchaser's receipt of the same. Purchaser shall deliver the Current Survey to Seller as soon as said Current Survey is available. Purchaser shall deliver written notice to Seller of any Unpermitted Exceptions (as defined below) deemed objectionable to Purchaser as shown on the Title Commitment within ten (10) days following Purchaser's receipt of both the Title Commitment and Current Survey, and, if Purchaser fails to timely deliver such title objection notice within such ten (10) day period following Purchaser's receipt of the Title Commitment and Current Survey, the exceptions and matters shown on the Title Commitment and depicted on the Current Survey shall be deemed acceptable to Purchaser and shall be Permitted Exceptions hereunder.

(b)     If Purchaser timely delivers a title objection notice related to items other than Permitted Exceptions or exceptions to title caused by Purchaser or any party claiming through or on behalf of Purchaser (such exceptions to title other than the Permitted Exceptions or exceptions to title caused by Purchaser or any party claiming through or on behalf of Purchaser are hereinafter referred to as "Unpermitted Exceptions"), then Seller shall have the right but not the obligation to elect to cure such Unpermitted Exceptions or Survey defects. Within ten (10) business days following receipt of Purchaser's title objection notice, Seller shall notify Purchaser whether it will take actions necessary to eliminate, cure or remove such Unpermitted Exceptions, including without limitation, by having Title Company waive such exceptions or defects or commit to insure over the same by causing the Title Company to commit to issue its customary endorsement insuring over same at Seller's sole cost. If Seller elects to cure any such disapproved matters, Seller shall cure such matters diligently and as soon as reasonably possible, to Purchaser's reasonable satisfaction, but in no event later than Closing. If Seller elects not to cure the Unpermitted Exceptions Purchaser may, as its sole and exclusive remedy under this Agreement, at law and in equity, within a subsequent period of five (5) Business days after Seller's ten (10) Business Day response period, terminate this Agreement (without either party being deemed at fault or in default hereunder), in which event the Earnest Money shall be returned to Purchaser and all rights, obligations and liabilities of the parties hereunder shall be released and discharged (except as otherwise set forth herein). In the event Purchaser does not terminate this Agreement within such five (5) Business Day period, subject to the other terms and conditions of this Agreement, Purchaser and Seller shall proceed to close and the Unpermitted Exceptions not cured or so insured over shall be Permitted Exceptions hereunder.

(c)     Notwithstanding anything contained in this Agreement to the contrary, Seller shall cause all outstanding real estate taxes which are due and payable, and its existing mortgage (if applicable) and any and all existing monetary liens recorded against the Property to be paid off at or before Closing.

7.     Title Policy.    At the Closing, the Title Company shall be irrevocably committed to issue to Purchaser, at Seller's expense (provided, however, that Purchaser shall be responsible for the costs and fees of any title endorsements or extended or additional coverage), an ALTA Form 2021 owner's policy of title insurance (the "Title Policy"), dated the Closing Date, for the Property based on the Title Commitment. Such title policy shall be issued by the Title Company,

shall be in the amount of the Purchase Price, and shall insure Purchaser's fee simple title to the Property, subject to no exceptions other than the Permitted Exceptions.  In addition, Purchaser may, at its sole cost, request any additional available endorsements or insurance it requires from the Title Company.

8.      Escrow.

(a)      Closing Escrow.  The purchase and sale of the Property (the "Closing") shall be closed in escrow by delivery of documents and closing deliverables to the downtown Chicago offices of the Title Company, with the Title Company or its affiliates acting as escrowee (the "Closing Escrowee"), in accordance with the general provisions of the customary deed and money escrow agreement then used by the Closing Escrowee, with such special provisions inserted therein as may be required to conform with this Agreement and the Sale Order (said deed and money escrow agreement and the escrow created thereby are hereinafter referred to as the "Closing Escrow Agreement" and "Closing Escrow" respectively), or as otherwise may be agreed to in writing by Seller and Purchaser. In the event of any conflict between the Closing Escrow Agreement and this Agreement, this Agreement shall prevail.

(b)      Cost of Escrow.  The cost of the Closing Escrow shall be divided equally between Purchaser and Seller.  Upon creation of the Closing Escrow, payment of the Purchase Price, delivery of the Deed and delivery of any and all other documents required under this Agreement shall be made through the Closing Escrow.

(c)      Either party may waive its appearance at Closing by providing to Escrow Agent on or before the date established for Closing all documents, funds and deliverables required to be delivered by said party pursuant to this Agreement along with written instruction as to the conditions (if any) for release thereof as well as instructions for the delivery of documents, funds and things to be delivered to said party.

9.      Closing Date.  Purchaser and Seller will close the purchase and sale of the Property, subject to the satisfaction of all conditions contained in this Agreement, on a date which is no later than ten (10) days following the date that Seller has obtained a final order from the US Bankruptcy Court in substantially the form of **Exhibit B** attached hereto and made a part hereof approving the sale of the Property to Purchaser in accordance with the terms and conditions set forth in this Agreement (the "Sale Order"), or at such other date or time as Purchaser and Seller may mutually agree in writing (the "Closing Date").

10.      Conditions Precedent to Obligation of Purchaser and Seller.

(a)  Without limiting any rights and remedies available under this Agreement, the obligation of Purchaser to consummate the transaction hereunder shall be subject to the fulfillment on or before the date of Closing of all of the following conditions, any or all of which may be waived by Purchaser in its sole discretion:

90378664.6

(i)     All of the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects as of the date of Closing.

(ii)     Seller shall have performed and observed, in all material respects, all covenants and obligations of this Agreement to be performed and observed by Seller as of the date of Closing.

(iii)     Title Company shall be prepared to issue to Purchaser an Owner's Policy of Title Insurance insuring title to the Property as vested in Purchaser subject only to the Permitted Exceptions.

(iv)     Seller shall have delivered the Seller's Closing Deliverables required under Section 11 of this Agreement,

(v)     Seller shall have obtained the Sales Order approved by the US Bankruptcy Court.

(b) Without limiting any rights and remedies available under this Agreement, the obligation of Seller to consummate the transaction hereunder shall be subject to the fulfillment on or before the date of Closing or other date specified herein of all of the following conditions, any or all of which may be waived by Seller in its sole discretion:

(i)     All of the representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects as of the date of Closing.

(ii)     Purchaser shall have performed and observed, in all material respects, all covenants and obligations of this Agreement to be performed and observed by Purchaser as of the date of Closing.

(iii)     Purchaser shall have delivered the Purchaser's Closing Deliverables required under Section 11 of this Agreement.

(iv)     Seller shall have obtained the Sales Order approved by the US Bankruptcy Court.

11.     <u>Closing Deliveries</u>.

(a)     All deposits to the Closing Escrow required to be made pursuant to the terms of this Agreement and the Closing Escrow Agreement shall be made on or before the Closing Date.  The Closing shall occur on the Closing Date in escrow by delivery of documents and closing deliverables to the offices of the Title Company located in downtown Chicago, Illinois, or at such other date, time and/or place as Purchaser and Seller may mutually agree in writing.

(b)     On or before the Closing Date, Seller shall execute, acknowledge, and/or deposit or cause to be deposited in the Closing Escrow the following closing documents:

6

(i)     a Special Warranty Deed (the "Deed");

(ii)     a 1099, and a FIRPTA affidavit setting forth Seller's United States taxpayer identification number and certifying that Seller is not a "foreign person" as that term is used under Section 1445(b)(2) of the Internal Revenue Code, as amended;

(iii)     the final Sale Order and a limited affidavit of title appropriate to the distressed circumstance surrounding the sale and/or such other information as to which the Title Company may require all in such form required by the Title Company to record the Deed and issue the Title Policy;

(v)     a so-called "bulk sales" certificate issued by the Illinois Department of Revenue and Cook County Department of Revenue showing that Seller does not have any liability under the Illinois Income Tax Act or the Illinois Retailers Occupation Tax Act to the extent required by the Title Company;

(v)     a settlement statement showing all of the payments, adjustments and prorations provided for in this Agreement and otherwise agreed upon by Seller and Purchaser; and

(vi)     such evidence as may be reasonably required by the Title Company with respect to the authority of the person(s) executing the Deed and other items necessary to issue the Title Policy to Purchaser.

(c)     On or before the Closing Date, Purchaser shall execute, acknowledge, and/or deposit or cause to be deposited into the Closing Escrow the following (the "Purchaser's Closing Deliverables"):

(i)     a settlement statement showing all of the payments, adjustments and prorations provided for in this Agreement and otherwise agreed upon by Seller and Purchaser;

(ii)     such evidence as may be reasonably required by Seller and the Title Company with respect to the authority of the person(s) executing the documents required to be executed by Purchaser; and

(iii)     the Purchase Price plus or minus prorations, and closing costs required to be paid by Purchaser in accordance with this Agreement, by wire transfer of immediately available funds.

(d)     On or before the Closing Date, Seller and Purchaser shall jointly deposit or cause to be deposited into the Escrow the following:

(i)     closing statement; and

(ii)     MyDec real estate transfer declaration approved by the parties

12.     <u>Representations and Warranties of Seller</u>.

(a)     Seller represents and warrants to Purchaser that, as of the date of this Agreement and again as of the Closing Date:

(i)     Seller is not a party to, and the Property is not subject to, any tenancies, contract, lease, agreement or commitment that will be binding on Purchaser or the Property following the Closing other than the Permitted Exceptions.

(ii)     Seller is a duly organized corporation validly existing and in good standing under the laws of the State of Illinois; subject to obtaining the Sale Order, Seller has the requisite power and authority to enter into and perform this Agreement; subject to obtaining the Sale Order, Seller's Closing Deliverables have been or will be duly authorized by all necessary action on the part of Seller and have been or will be duly executed and delivered; execution, delivery, and performance by Seller of such documents will not conflict with or result in a violation of Seller's organizational documents, or subject to obtaining the Sale Order, of any judgment, order or decree of any court or arbiter to which Seller is a party; such documents are valid and binding obligations of Seller, and are enforceable against Seller in accordance with their terms, subject to applicable bankruptcy, insolvency, reorganization, creditor's rights, and other similar laws and subject to obtaining the Sale Order and any consents that may be required from any third parties.

(iii)     There is no condemnation proceeding pending which affects the Property, nor, to the best of Seller's knowledge, is any such proceeding threatened.

(iv)     Seller is not, and will not become, a person or entity with whom United States persons or entities are restricted or prohibited from doing business under regulations of the Office of Foreign Asset Control ("<u>OFAC</u>") of the Department of the Treasury (including those named on OFAC's specially designated and blocked persons list) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action and is not and will not engage in any dealings or transactions or be otherwise associated with such persons or entities.

(iv)     Seller has not been served with written notice of any, and, to Seller's actual knowledge without inquiry, other than obtaining the Sale Order, there are no suits or claims pending or to Seller's knowledge, threatened with respect to or in

8

any manner affecting the Property or Seller which would affect Seller's ability to perform its obligations under the Purchase Agreement.

(v)    Seller has not entered into any material commitments, leases, contracts or other agreements with any governmental authorities or agencies or with any other third parties which will be binding upon or otherwise affect the Property following the Closing Date.

(vi)    Seller has not received any written notice of any Hazardous Materials (as defined below) located on the Property in violation of any Environmental Laws (as defined below).  For the purposes of this paragraph "Hazardous Materials" shall mean any substance or material that is regulated as a "hazardous material" or "hazardous substance" under any federal, state or local laws, including but not limited to friable and non-friable asbestos, perchloroethylene and/or petroleum hydrocarbons.  "Environmental Laws" shall collectively refer to the Comprehensive Environmental Response, Compensation and Liability Act, as amended, The Toxic Substances Control Act, the Clean Water Act 33 U.S.C. § 1251, the Resource Conservation and Recovery Act as amended, or any other similar federal, state or local law, rule or regulation respecting Hazardous Materials together with all rules and regulations promulgated thereunder and all amendments thereto.

(vii)    There are no judgments, orders, or decrees of any kind against Seller unpaid or unsatisfied of record, nor to Seller's actual knowledge without inquiry, threatened against Seller, which would have a binding effect on Purchaser or the Property.

(b)    If, on or before the Closing Date, (i) Seller notifies Purchaser that any of Seller's representations and warranties were not true in all material respects when made or is not true or will not be true in all material respects with the same effect on and as of the Closing, or (ii) Purchaser discovers any error, misstatement or omission in any such representation or warranty, Purchaser shall have the right to terminate this Agreement by written notice thereof to Seller.  Upon receipt of such notice, this Agreement shall terminate and be of no further force and effect and, provided Purchaser is not otherwise in default hereunder, the Earnest Money previously deposited by Purchaser shall be promptly returned to Purchaser.  Notwithstanding anything in this Agreement to the contrary, Seller's representations and warranties shall not be rendered untrue or deemed false because of any matter which becomes untrue as a result of any act or omission of the Purchaser.

13.    Representations and Warranties of Purchaser.

(a)    Purchaser represents and warrants to Seller that, as of the date of this Agreement and again as of the Closing Date:

(i)     This Agreement has been duly executed by Purchaser, constitutes the legal and binding obligation of Purchaser, and is enforceable against Purchaser in accordance with its terms.

(ii)     Purchaser is a duly organized corporation validly existing and in good standing under the laws of the State of Illinois; Purchaser has the requisite power and authority to enter into and perform this Agreement; Purchaser's Closing Deliverables have been or will be duly authorized by all necessary action on the part of Purchaser and have been or will be duly executed and delivered; execution, delivery, and performance by Purchaser of such documents will not conflict with or result in a violation of Purchaser's organizational documents, or of any judgment, order or decree of any court or arbiter to which Purchaser is a party; such documents are valid and binding obligations of Purchaser, and are enforceable against Purchaser in accordance with their terms, subject to applicable bankruptcy, insolvency, reorganization, creditor's rights, and other similar laws and subject to any consents that may be required from any third parties.

(b)     If, on or before the Closing Date, (i) Purchaser notifies Seller that Purchaser's representations and warranties were not true in all material respects when made or is not or will not be true in all material respects with the same effect on and as of the Closing, or (ii) Seller discovers any material error, misstatement or omission in any such representation or warranty, Seller shall have the right to terminate this Agreement by written notice thereof to Purchaser. Upon receipt of such notice, this Agreement shall terminate and be of no further force and effect, and the Earnest Money shall be delivered to Seller and applied as liquidated damages as Seller's sole and exclusive remedy.

14.     Default.

(a)     Seller Default.  In the event that Seller defaults in the performance of any of Seller's obligations under this Agreement, Purchaser shall have all of its rights and remedies available at law and in equity on account of such default, including without limitation, the right to pursue the remedy of specific performance of Seller's obligations under this Agreement, and Seller shall be liable for and pay to Purchaser an amount equal to its attorneys' fees and court costs in enforcing its rights and remedies under this Agreement.

(b)     Purchaser Default.  In the event that Purchaser defaults in the performance of any of its obligations under this Agreement, Seller may, as its sole remedy, terminate this Agreement and receive the Earnest Money and all interest earned thereon from the Escrow Agent, as liquidated damages, in which event this Agreement shall be deemed null and void and the parties shall be released from all further obligations and liabilities under this Agreement, except with respect to the surviving obligations.  It is recognized by Seller and Purchaser that the damages Seller will sustain by reason of Purchaser's default, breach or failure will be substantial, but difficult, if not impossible, to ascertain. The Earnest Money has been determined by the parties as a reasonable sum for damages.

90378664.6

15.     <u>Prorations and Expenses</u>.

(a)     Seller shall pay at or prior to Closing all real estate taxes for the Property which are required to be paid for all periods prior to the Closing. All real estate taxes for the calendar year 2023 shall be prorated between Seller and Purchaser as of the Closing Date based upon 110% of the 2022 full-year real estate tax bill for the Property, and with Purchaser receiving a credit in the amount of Seller's estimated liability for 2023 taxes calculated by multiplying the full year 2022 real estate tax bill by 110%, and then multiplying the result by a fraction, the numerator of which is the number of days in calendar year 2023 from January 1, 2023 through the Closing Date, and the denominator of which is 365. The tax proration shall be final.  Seller shall pay all special assessments (and charges in the nature of or in lieu of such assessments) levied, pending or constituting a lien with respect to the Property as of the Closing Date.

(b)     At Closing, Seller shall pay all recording charges for the release of its existing mortgages, and the title insurance premiums for the Title Policy, and one-half of the closing escrow fee.  Purchaser shall pay the recording fees for the deed and any mortgage of Purchaser, the costs and fees for the Current Survey, all costs, fees and title insurance charges incurred in connection with any title endorsements and extended coverage, all of Purchaser's due diligence studies and investigations, the costs of any mortgage loans obtained by Purchaser, all transfer or stamp taxes imposed by the State of Illinois, County of Kane, and Village of Huntley, if any, and one-half of the closing escrow fee.  Except as provided herein to the contrary, the parties shall each be solely responsible for the fees and disbursements of their respective counsel and other professional advisers.

16.     <u>Certain Covenants and Other Agreements of the Parties</u>.  From the Effective Date hereof until Closing or earlier termination of this Agreement, Seller shall not enter into or amend any written or oral service contract or other agreement with respect to the Property that will be binding upon Purchaser following the Closing without Purchaser's written consent.

17.     <u>Condemnation; Casualty</u>.  The provisions governing a condemnation and/or casualty to the Property, are as follows:

(a)     <u>Condemnation</u>. Seller agrees to give Purchaser prompt written notice of any action or proceeding threatened, contemplated, instituted or pending in eminent domain or for condemnation affecting all or any part of the Property.  If, prior to the Closing, all or any material part of the Property is taken by condemnation or eminent domain, or any action or proceeding is threatened, contemplated, instituted or pending in eminent domain or condemnation affecting all or any material part of the Property (a "<u>Taking</u>"), Purchaser may, as Purchaser's sole and exclusive remedy hereunder, at law and in equity, but subject to the preceding limitation, within ten (10) Business days of Purchaser's receipt of Seller's notice of such Taking, elect by notice in writing to Seller within such period to terminate this Agreement, in which event the Earnest Money shall be forthwith delivered to Purchaser and neither party shall have any further liability to the other.  In the absence of such written election by Purchaser, Purchaser shall be deemed not to have elected to

terminate this Agreement pursuant to the terms hereof, and, if Purchaser purchases the Property as contemplated by this Agreement, Purchaser shall be entitled to the entire award or settlement resulting from the Taking.

(b)   Casualty. All risk of loss or destruction to the Property, or any part thereof, prior to transfer of legal title lies solely with Seller.  After Closing, Purchaser shall bear the risk of loss or destruction to the Property. Seller shall notify Purchaser of any loss or destruction to the Property, which occurs prior to Closing. In such event, Purchaser shall have the option of accepting a conveyance and transfer of title to the Property as damaged or destroyed, including an assignment of any insurance claim or proceeds which may be due or which will become due as the result of such loss or casualty, without reduction in the Purchase Price, or Purchaser may terminate this Agreement and receive a return of the Earnest Money without further liability under this Agreement.

18.   Notice.  All notices and all other items herein permitted or required to be provided or furnished by either party to the other party shall be in writing and shall be either (a) delivered in person or (b) sent by private courier guaranteeing next-day delivery (such as FedEx or UPS), delivery charges prepaid, or (c) sent by United States registered or certified mail, postage prepaid, return receipt requested, or (d) delivered by email addressed to the respective parties at the following addresses, or at such other address or addresses designated in writing by the appropriate party:

If to Purchaser to:

c/o The Prime Group, Inc.
120 N.  Street, Suite 2800
Chicago, Illinois 60602
Attention: Jeffrey Breaden and Michael W. Reschke, Jr.
Email: jbreaden@primegroupinc.com and mreschkejr@primegroupinc.com

with a copy to:

Law Office of William J Ralph LLC
400 E Ohio Street #2904
Chicago, Illinois 60611
Attention: William J. Ralph
Email: wralph@brllp.com

If to Seller to:

Friendship Village of Schaumburg
350 West Schaumburg Road
Schaumburg, Illinois 60194
Attention: Michael Flynn
Email : Mike.Flynn@myFSO.org

with a copy to:

Polsinelli PC
150 N. Riverside Plaza, Suite 3000
Chicago, Illinois 60606
Attention: Emina Kwok, Jeremy Johnson, and Trinitee Green
Email: ekwok@polsinelli.com, jeremy.johnson@polsinelli.com,
    tggreen@polsinelli.com

If to Title Company:

First American Title Insurance Company
National Commercial Services
30 N. LaSalle Street, Suite 2700
Chicago, Illinois 60602
Direct: (312) 917-7250
Cell:    (414) 639-4252
Email: Mr. Jan Haapala, jhaapala@firstam.com

Any notice permitted or required to be given shall be deemed to have been given, and any item permitted or required to be delivered or furnished shall be deemed to have been delivered or furnished, when personally delivered or furnished, or one (1) Business Day after delivery to a courier for next-day delivery with delivery charges prepaid, or three (3) Business days after delivery to a United States Post Office, properly addressed and with postage prepaid, for delivery by United States registered or certified mail, or upon transmittal if sent by email prior to 5:00 p.m. (Central Time) on such Business Day, or upon the following Business Day if such e-mail is sent after 5:00 p.m. (Central Time).

19.    Brokerage Commission.  Purchaser and Seller each represent and warrant to the other that it has not dealt with any consultant, real estate broker or agent in connection with this transaction except for Adam Haefner at Avison Young ("Broker").  Seller shall pay the commission due to Broker at Closing in an amount required to be paid pursuant to a separate listing agreement with Broker.  Purchaser and Seller each agree to indemnify and hold the other harmless from and against any claims, liabilities, damages, costs and expenses (including but not limited to court costs and reasonable attorneys' fees) suffered or incurred by the other on account of a breach of the above representation and warranty.

20.    Assignment.  Except as provided below, it is understood and agreed that, unless Seller shall consent in writing, which consent may be withheld or conditioned in Seller's sole and absolute discretion, Purchaser has no right to assign its rights under this Agreement to any other person, party or entity and that, unless Seller shall so consent, no assignee shall be in and stand in the same place and stead as Purchaser with all of the Purchaser's rights and privileges herein, and Purchaser shall remain subject to all of the terms and conditions of this Agreement. Notwithstanding the foregoing, Purchaser may assign Purchaser's rights, title and interests hereunder to any entity created by Purchaser to take title to the Property and/or any entity in which Purchaser or its principals are a member or partner without the consent of Seller, provided that

13

such assignment shall not relieve Purchaser of its obligations under this Agreement and provided that Purchaser delivers notice of such assignment to Seller at least five (5) business days before Closing.

21.    <u>Time is of the Essence</u>.  Seller and Purchaser agree that time is of the essence in the performance by the parties of their obligations hereunder.

22.    <u>Entire Agreement</u>.  This Agreement contains the entire agreement between the parties with respect to the purchase and sale of the Property, and the same may not be modified or discharged nor may any of its terms be waived, except by an instrument in writing signed by the parties hereto.

23.    <u>Persons Bound</u>.  Subject to the restrictions of Section 20 above, this Agreement, and all covenants and provisions herein contained, shall bind and inure to the benefit of the parties hereto and their respective heirs, personal representatives, administrators, executors, successors and permitted assigns.

24.    <u>Further Assurances</u>.  Except as expressly provided herein to the contrary, the parties each agree to do, execute, acknowledge and deliver all such reasonable further acts, instruments and assurances and to take all such further reasonable actions before or after Closing as shall be reasonably necessary or desirable to fully carry out this Agreement and to fully consummate and effect the transactions contemplated hereby.

25.    <u>No Third Party Benefits</u>.  This Agreement is for the sole and exclusive benefit of the parties hereto and their respective nominees, heirs, successors and permitted assigns, and no third party is intended to or shall have any rights or benefits hereunder.

26.    <u>No Partnership or Joint Venture</u>.  Nothing contained in this Agreement is intended or shall be construed in a manner to create any relationship between Seller and Purchaser other than the relationship of seller and purchaser, and Seller and Purchaser shall not be considered agents of the other, joint venturers or partners for any purpose.

27.    <u>As-Is Sale; Release</u>.  Except as otherwise expressly set forth in this Agreement, Seller has made no warranties or representations, written or oral, express or implied, in any way related to Seller or the Property including, without limitation, the condition of the Property or any improvements, fixtures or systems (if any), the presence or absence of any hazardous waste or substances in, at, under or migrating to or from the Property, the Property's compliance or noncompliance with any laws and regulations including, without limitation, any environmental laws, or the suitability or fitness of the Property for any particular purpose.  Except as otherwise expressly set forth in this Agreement or the other documents executed by Seller in connection with the transactions contemplated hereunder, Purchaser agrees to accept the Property, in its "AS-IS," "WHERE-IS", "WITH-ALL-FAULTS" condition.   , Except as otherwise provided in this Agreement, Purchaser hereby fully and forever waives, releases, discharges and acquits Seller from any and all losses, known or unknown, foreseen or unforeseen (including but not limited to, claims based on contract, right of contribution, common law and/or federal, state or local statute or ordinance, or in any way arising out of, relating to or resulting from any other tort alleged to

90378664.6

have been committed by Seller in connection with or related to the sale of, or the condition of the Property or connected with Purchaser's acquisition, ownership, development or use of the Property, provided however, the foregoing release shall not be deemed to be a waiver by Purchaser of the specific conditions precedent to Purchaser's obligation to close, as expressly set forth and specified in this Agreement, and the foregoing release shall specifically exclude claims based on: (i) Seller's fraud or Seller's misrepresentations or breach of any of the specific covenants, warranties and representations expressly set forth in this Agreement or in the closing documents or any documents executed by Seller in connection with the transaction described in this Agreement, and (ii) Seller's breach of the limited indemnities expressly provided by Seller under the specific terms of this Agreement. The Purchase Price for the Property takes into account and shall sufficiently compensate Purchaser for all the terms of the conveyance of the Property including, without limitation, Purchaser's obligation to accept the Property, in an "AS-IS," "WHERE-IS", "WITH-ALL-FAULTS" condition and Purchaser's , release of Seller to the extent set forth in this Agreement.

28.    <u>Miscellaneous</u>.

(a)    The headings and captions herein are inserted for reference only and the same shall not limit or construe the paragraphs or sections to which they apply or otherwise affect the interpretation hereof.

(b)    Words importing persons shall include firms, associations, partnerships (including limited partnerships), trusts, corporations, limited liability companies and other legal entities, including public bodies as well as natural persons and vice versa where the context so requires.

(c)    This Agreement and any document or instrument executed pursuant hereto may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(d)    The invalidity of any of the provisions of this Agreement shall not affect or impair the validity or enforceability of the remainder of this Agreement.

(e)    The term "<u>business day</u>" shall mean any calendar day other than Saturday, Sunday, any United States or State of Illinois holiday and any day on which banks in Chicago, Illinois are authorized to close.  Whenever under the terms of this Agreement the time for performance of a covenant or condition falls on a day that is not a business day, such time for performance shall be extended to the next business day. Otherwise all references herein to "days" shall mean calendar days unless otherwise stated.

(f)    If any action, suit or legal proceeding is sought, taken, instituted or brought by any party to this Agreement to enforce its rights under this Agreement, all costs, expenses and fees, including, without limitation, court costs and reasonable attorneys' fees, of the prevailing party in such action, suit or proceeding shall be borne by the losing party.

(g)     This Agreement shall be construed and enforced in accordance with the internal laws of the State of Illinois, without giving effect to choice of law principles.

(h)     A facsimile, telecopy or other reproduction of this Agreement, or any document executed in connection with the same, may be executed by one or more parties hereto, and an executed copy of this Agreement, or any document executed in connection with the same, may be delivered by one or more parties hereto by electronic transmission and such execution and delivery shall be considered valid, binding and effective for all purposes.  At the request of any party hereto, all parties hereto agree to execute an original of this Agreement, or any document executed in connection with the same, as well as any facsimile, telecopy or other reproduction hereof.

(i)     Time is of the essence in the performance of each party's obligations hereunder.

**[Signatures on following page]**

90378664.6

IN WITNESS WHEREOF, the parties hereto have executed this Agreement to be effective as of the Effective Date.

SELLER:

Evangelical Retirement Homes of Greater Chicago, Incorporated d/b/a Friendship Village of Schaumburg

By: _____

Name: Mike Flynn

Title: Chief Executive Officer

Chicago Title Land Trust Company, not personally, but solely as Trustee under Trust Agreement dated as of June 13, 2000 and known as Trust No. 1108559

By: _____

Its: Duly Authorized Trust Officer

PURCHASER:

The Prime Group, Inc.

By: _____

Name: Michael W. Reschke

Its: Chairman and CEO

IN WITNESS WHEREOF, the parties hereto have executed this Agreement to be effective as of the Effective Date.

SELLER:

Evangelical Retirement Homes of Greater Chicago, Incorporated d/b/a Friendship Village of Schaumburg

By: _____
Name: Mike Flynn
Title: Chief Executive Officer

Chicago Title Land Trust Company, not personally, but solely as Trustee under Trust Agreement dated as of June 13, 2000 and known as Trust No. 1108559

By: _____
Its: Duly Authorized Trust Officer

PURCHASER:

The Prime Group, Inc.

By: _____
Name: Michael W. Reschke
Its: Chairman and CEO

IN WITNESS WHEREOF, the parties hereto have executed this Agreement to be effective as of the Effective Date.

SELLER:

Evangelical Retirement Homes of Greater Chicago, Incorporated d/b/a Friendship Village of Schaumburg

By: _____
Name: Mike Flynn
Title: Chief Executive Officer

Chicago Title Land Trust Company, not personally, but solely as Trustee under Trust Agreement dated as of June 13, 2000 and known as Trust No. 1108559

By: _____
Its: Duly Authorized Trust Officer

PURCHASER:

The Prime Group, Inc.

By:_____
Name: Michael W. Reschke
Its: Chairman and CEO

IN WITNESS WHEREOF, the parties hereto have executed this Agreement to be effective as of the Effective Date.

SELLER:

Evangelical Retirement Homes of Greater Chicago, Incorporated d/b/a Friendship Village of Schaumburg

By: _____
Name: Mike Flynn
Title: Chief Executive Officer

This instrument is executed by the undersigned Land Trustee, not personally but solely as Trustee in the exercise of the power and authority conferred upon and vested in it as such Trustee. It is expressly understood and agreed that all the warranties, indemnities, representations, covenants, undertakings and agreements herein made on the part of the Trustee are undertaken by it solely in its capacity as Trustee and not personally. No personal liability or personal responsibility is assumed by or shall at any time be asserted or enforceable against the Trustee on account of any warranty, indemnity, representation, covenant, undertaking or agreement of the Trustee in this instrument.

Chicago Title Land Trust Company, not personally, but solely as Trustee under Trust Agreement dated as of June 13, 2000 and known as Trust No. 1108559

By: _____
Its: Duly Authorized Trust Officer

PURCHASER:

The Prime Group, Inc.

By: _____
Name: Michael W. Reschke
Its: Chairman and CEO

## EXHIBIT A

## THE PROPERTY

THE WEST 175.86 FEET OF LOT 3 (AS MEASURED PARALLEL AND PERPENDICULAR TO THE WEST LINE OF SAID LOT 3) IN HUNTLEY CORPORATE PARK PHASE 2 SUBDIVISION, BEING A SUBDIVISION OF PART OF SECTION 8, TOWNSHIP 42 NORTH, RANGE 7 EAST OF THE THIRD PRINCIPAL MERIDIAN ACCORDING TO THE PLAT THEREOF RECORDED FEBRUARY 16, 1999 AS DOCUMENT 1999K016920, IN VILLAGE OF HUNTLEY, KANE COUNTY, ILLINOIS.

# CHICAGO TITLE LAND TRUST COMPANY

### 10 S. LaSalle Street, Suite 2750, Chicago, IL 60603

Date:   November 22, 2023

To Whom It May Concern:

**RE:    CHICAGO TITLE LAND TRUST COMPANY,
Trustee under Trust No. 1108559**

You are hereby authorized and directed to pay the overage funds for the purchase of Partial Lot 3 in Huntley Corporate Park Phase 2 Subdivision, Huntley, Kane County, Illinois 60142 to:

**EVANGELICAL RETIREMENT HOMES OF GREATER CHICAGO, INCORPORATED D/B/A FRIENDSHIP VILLAGE OF SCHAUMBURG.**

This authorization is given pursuant to the direction of the beneficiaries of said Land Trust empowered to the direct the trustee.

**CHICAGO TITLE LAND TRUST COMPANY
as Trustee as aforesaid**

By: _____
**Assistant Vice President**

# **EXHIBIT B**

## **SALE ORDER**

[ATTACHED]

90378664.6